**Deanna M. Akin, Plaintiff-Appellant, v. Robert F. Akin, Defendant-Appellee.**

Gen. No. 68–66.

Fifth District.

May 26, 1969.

Rehearing denied June 25, 1969.

Sprague, Sprague & LeChien, of Belleville (John R. Sprague and Thomas A. LeChien, of counsel), for appellant.

Robert E. McGlynn, McGlynn & McGlynn, of East St. Louis, for appellee.

GEORGE J. MORAN, J.

Plaintiff, Deanna M. Akin, appeals from a divorce decree of the Circuit Court of St. Clair County, awarding her husband, Robert F. Akin, custody of Sheila Akin, the minor child of the parties. She also appeals from a denial of her petition to modify the decree so as to grant her custody of Sheila. These appeals have been consolidated in this court for review.

Plaintiff filed a complaint for divorce on February 15, 1967, charging defendant with extreme and repeated cruelty and asking for custody of their seven-year-old minor child, Sheila. Defendant filed a counterlcaim for divorce and asked for custody of the child. Both plaintiff and defendant alleged that they were separated November 22, 1966. The trial of this cause commenced on March 16, 1967 and at the conclusion of the hearing on that date, the defendant withdrew his counterclaim for divorce and the parties agreed to a stipulation as to the property rights between them whereby plaintiff waived all right to alimony or support for herself and agreed to pay all of her own costs and attorney's fee. The only matter left in dispute was the final custody of Sheila and therefore our discussion of the evidence will be confined to that issue.

## TESTIMONY

### March 16, 1967 Hearing

*Deanna Akin,* plaintiff, testified that Sheila had been residing with plaintiff's mother and father in Collinsville, Illinois since the November 22, 1966 separation; that defendant was never close to Sheila and that he never had time for her when she wanted him to read or play with her; that he had a habit of looking at pictures of nude women in front of Sheila and leaving them lie around the house and when she would complain to him about this he would say, "She has to learn some day, anyway." She also testified that her husband drank a lot, causing his temper to become uncontrollable and that he had beaten her at various times. She further testified that Sheila had improved quite a bit since the separation, was not nearly so nervous as she had been, and seemed happy in her new surroundings; that Sheila had been held back a year in school while living with plaintiff and defendant, but her grades had improved and she had been attending school regularly since November of 1966.

On cross-examination plaintiff testified that she had lived with her sister and her sister's husband for about five weeks immediately after the separation; that she then went to Sparta, Illinois, where she stayed with a friend for about a week until she got her own apartment which she has had since about December. She stated that she had not worked since the separation. She also testified that it was possible that she, herself, could have been partially responsible for the nervousness of the child; that she had been in Alton State Hospital for a couple of weeks and had been treated for nervousness for the past two years. She said that the reason her daughter lost a year in school was because she had been sick and absent.

The trial judge asked plaintiff what plans she would make if the custody would be awarded to her. She answered that she had been looking for work and had just moved back with her mother and father the past week. She had not been looking for work in Collinsville where her mother and father live, but rather in Sparta.

*Robert Akin,* defendant, was called under Section 60 and testified that he had spanked his daughter only three times in her life and then only to correct her; that he had never beaten her, just spanked her. He further stated that his wife had been sick quite often with nervous disorders throughout their married life; that he had a good job and a three bedroom mobile home and that if awarded the child he intended to have his eighteen year old niece, who had a five months old baby, live in his home and take care of Sheila.

At the conclusion of this hearing, the court entered the following order:

> "Defendant's counterclaim for divorce withdrawn. Cause heard. Divorce granted to plaintiff on grounds of cruelty. Custody of minor child to remain with Lorena Elliott, grandmother, pending investigation in re final custody of minor child.
>
> ENTER: Francis E. Maxwell
> Judge of the Circuit Court"

## August 17, 1967 Hearing

*Deanna Akin* testified again and stated that at times her husband displayed affection for the child and at other times did not bother or want to be bothered; that he was not home very much; that he was generous with Sheila at times and at other times he was not; that her husband quarreled often with her mother and did not want her mother to keep the child; that she had seen Sheila every Sunday and had called her throughout the week while she was living in Sparta; that since Sheila has resided with

153

her mother, she is much better and is now happy and well contented.

*Robert Akin* also testified again and said that he was thirty-four years of age and lived at the Santa Barbara Trailer Court on Route 50 in French Village with his mother who had been there about four months; that he had a three bedroom trailer which he was buying on payments; that he had been a switchman for the Burlington Railroad for about ten years and was earning $130 per week working straight days. He stated that when he and the plaintiff lived together, Sheila was very nervous and in his opinion this was caused by her mother who was always nagging at her. He further stated that he and the plaintiff did not get along very well and that they quarreled constantly; that he had a lot of affection for Sheila and had suitable living quarters for her; that he had not visited her for the past couple of months because of his mother-in-law with whom he had never been very friendly; that he was dating a woman who had two children. His mother, who was separated from her husband and had been living with him since just after the March hearing would assist in taking care of Sheila.

*Mrs. Lorena Elliott*, the mother of Deanna and the grandmother of Sheila, testified that Sheila was living with her at 1311 Leland Street, Collinsville, Illinois; that she had another daughter, Cathy, fifteen; that her husband worked out of a construction local and they had a three-bedroom home; that Sheila had been with her since last November and had gone to school since that time; that her performance in school had been good and she was no longer nervous; that she would be forty-five soon and her husband would be fifty-two in September; that her husband earned about $150 per week and he loves Sheila as his own; that they were keeping the child because the mother and father had brought Sheila to them until they could find out what they were going to do; that she did not have occasion to visit her daughter and

154

husband's home often inasmuch as they would bring Sheila to her home because "they were gone a lot."

Mrs. Elliott went on to say that neither plaintiff nor defendant had much patience with the child, "I don't want to hurt anyone, but I did feel sorry for Sheila. They were always hollering at her when she wanted something to eat. When you are sick you don't have patience. That child was just starved all the time. They just didn't let her do things like a child should." She also stated that the child wanted to live with her all the time; that plaintiff and defendant would bring the child to her home frequently when Sheila was sick or for some other reason; that Sheila stayed with her mother quite often and that her mother stayed at plaintiff and defendant's home when Deanna was sick and took care of Deanna and Sheila.

She further testified that the plaintiff did not presently have a large place to keep Sheila, just a sleeping room in Sparta where she was working; that Sheila was now in good health; that she had taken Sheila for her tetanus shot and that the child was doing very well. She also stated that she was not asking to have custody of the child awarded to her but that she would be glad to take her if it was the court's decision.

*Leona Littel,* the grandmother of Deanna Akin and the mother of Mrs. Lorena Elliott, testified that Sheila lived under intolerable conditions when residing with plaintiff and defendant; that the child was very nervous, upset and unhappy because there was no peace in the family and that Sheila's condition was the fault of both plaintiff and defendant. She further testified that Deanna had been and still was a sick person; that Sheila's condition had been considerably improved during her stay with Mrs. Elliott.

*Robert M. Crabtree,* the court's witness who was a youth counselor and probation officer for the Courts Service of St. Clair County, then testified that he had

155

investigated the condition of the properties of the Elliotts and Robert Akin and that both properties were suitable for the raising of a minor child. However, he did not make any recommendation as to custody of the child.

## December 21, 1967 Hearing

The trial judge announced at the commencement of this hearing that he had been puzzled about the matter and apologized for putting off a decision for as long as he had. He stated that he had written a letter to the lawyers telling them that the custody of the child should be vested in the defendant, but then had received a petition for rehearing and for additional testimony from a new lawyer who said he now represented the plaintiff. He further stated that he would not sign the order until he heard the additional testimony.

*Deanna Akin* testified that she wanted custody of the child and always had wanted custody; that she was then employed at Weber's Steak House in Sparta, which is a restaurant where they do not serve liquor; that she was earning $45 a week plus tips; that she had rented for $85 a month a three room furnished apartment in Sparta about five blocks from work and four blocks from school; that she was also attending high school two nights a week, studying math, history, English and science; that she had been living in the new apartment only since the previous week; that she had been told by her lawyer and the trial judge that she did not have to make arrangements about an apartment before that time.

*Robert Akin* testified that under Section 60 that he was now married to Carlene Sullivan Oliver and had been married since the spring of 1967; that Carlene had a boy six years of age and a girl, nine, and that they went to school on a school bus; that he had not seen Sheila for two or three months because of disagreements with his mother-in-law.

156

*Sheila Akin* was also called to the stand during this hearing. She stated that she loved both her father and mother, but would rather live with her mother because her mother was good to her and bought her things.

On January 19, 1968, the court entered a final decree awarding custody of the minor child to defendant. Plaintiff filed a post trial motion which was denied after a hearing on March 7, 1968.

## OPINION

█ Both parties agree that the determinative factor in awarding custody of a minor child is the best interest of the child. The guiding star is and must be, at all times, the best interests of the child. Nye v. Nye, 411 Ill 408, 105 NE2d 300. It is thus the rights of the child and not the rights of the parents which are to be decided.

Our Supreme Court in Nye v. Nye, supra, at page 414 further specified how the best interests of the child are to be discerned:

"Under our divorce statute the court is clothed with a large discretion in determining to which parent a child will be given. It is usual in such cases, due to the tender years of the child and in consideration of its best interests, to entrust its care and custody to the mother, she being a fit and proper person to rear the child. (Miner v. Miner, 11 Ill 43; Draper v. Draper, 68 Ill 17.) The maternal affection is more active and better adapted to the care of the child. Especially is this true in the case of a minor daughter, where the care and guidance of a mother's hand is doubly important. This principle has become so well fixed and followed in this State that this court has not in recent years been called to rule upon it. Therefore, compelling evidence must be presented, proving the mother to be an unfit person, to cause the custody of her minor daughter to

157

be denied her or, there must be a positive showing that to deny custody to the mother would be for the best interests of the child."

The Nye case thus not only establishes the general rule that it is the best interests of the child which must be determinative in child custody cases, but also establishes the corollary that these best interests are served by awarding custody to the mother. This corollary can be upset only by compelling evidence proving the mother to be unfit or by a positive showing that a denial of custody to the mother would be in a child's best interests.

In the instant case the trial court in a letter sent to counsel on both sides, specifically found that Deanna was a fit person for the care of the minor child. A determination of this case must therefore turn on whether there can be said to be a positive showing that the best interests of the child would be served by denying plaintiff custody.

Plaintiff has strongly urged application of the Nye doctrine because she claims that the necessity of her maternal influence is particularly relevant in this case, as it will be in the next few years that this child will begin to develop into a woman, and that the child should not be placed in a situation in which the only female counseling she will receive during this critical stage of her life will be from a person who is a total stranger, namely, defendant's new wife.

We agree with plaintiff's contention as to the manner in which it expresses the basic understanding of why the Nye doctrine was evolved, but we still must persist to determine if there was a positive showing that the denial of custody to her was in the child's best interests.

It was the trial court's finding that plaintiff lacked sufficient interest in the minor child. This finding was based on the fact that plaintiff did not acquire quarters which were adequate for the raising of a minor child

until one week before the December hearing and the trial court's understanding the plaintiff was seeking an award of custody for her mother rather than for herself.

Plaintiff contends that the trial court's finding that she lacked interest in acquiring custody of her child was an improper consideration and against the manifest weight of the evidence. She argues that the reasons she had not acquired suitable quarters until recently were that she could not afford such quarters and that she had been told by her lawyer and the trial judge that such facilities were unnecessary until such time as custody would be awarded to her. It is unjust and illogical, she contends, to expect a woman who had previously totally relied upon her husband for financial stability to be able to support a family by herself, immediately subsequent to a divorce with no aid from her husband. She further points out that if she had been awarded custody, defendant would have been obliged to provide for support, thus enabling her to acquire sufficient funds to properly provide for her daughter.

Plaintiff also argues that the trial court's feeling that she wanted her mother to have custody of the child was a misconception and was improper because the hearings were to determine custody only as between parties to the suit. She also reasons that the mere fact that she enlisted counsel to petition the court for custody of her daughter is indicative of her interest.

Defendant's answer to plaintiff's arguments consists of continued references to her lack of suitable facilities for the care of a minor child. It is defendant's position that plaintiff's lack of suitable quarters can only be attributed to her lack of interest in the minor child.

Defendant also argues that the trial court was correct in concluding that the plaintiff was seeking custody of the child for her mother. He says that this can be seen in the manner in which plaintiff testified that the child was getting along so well and progressing so well now that

the child was under Mrs. Elliott's care. Also, plaintiff's witness, her grandmother, directed her testimony to the well-being of the child living with Mrs. Elliott.

Defendant points out that it was only when plaintiff learned that the child was in fact to be taken from Mrs. Elliott and custody given to him that she became so aggressive in seeking new quarters and custody of the child. He therefore maintains that it was only plaintiff's hatred for him rather than her maternal instinct which prompted her to change her course of conduct in less than a week.

After carefully reviewing the evidence and arguments in this case, we find it impossible to say that there is a positive showing that the best interests of the child would be served by denying plaintiff custody. We cannot resist the argument that plaintiff was simply financially unable to obtain suitable living quarters for the child. It is extremely difficult for a divorced wife who had previously only served as mother and housewife to adjust to the economic burdens which are suddenly placed upon her. This is especially so when the wife is receiving no alimony or support from her husband. In this regard, plaintiff's failure to obtain suitable quarters is only a positive showing of one of the economic realities of our society and is not sufficient, standing alone, to indicate her lack of interest in her child.

We are also not convinced that plaintiff was not seeking custody of the child for herself. That she testified that the child was getting along so well with Mrs. Elliott indicates nothing more than the truth. We cannot fault plaintiff for being content while Mrs. Elliott had custody because it was during this period that Sheila began to develop normally and that Sheila's prior nervous condition began to disappear. Allowing her daughter to remain in such an environment may have been nothing more than an unselfish act on the part of plaintiff. Accordingly, it was only natural for plaintiff to react when she learned that defendant was to be given custody.

160

She did not wish for her daughter to be removed from surroundings where the child was happy and was progressing so well and placed in a home where she felt the child would not be happy and where her progress would be hindered. The aggressive efforts of plaintiff in December, 1967 are understandable in view of the nature of a change of custody from Mrs. Elliott to defendant. Not only would the child have to adjust to a new home, she would have to adjust to a new stepmother, stepsister and stepbrother. She would be forced into a situation where she would have to compete with two natural children for the love and counsel of their mother.

Then too, there was no showing at any of the hearings that Sheila's interests would be better served by awarding custody to the father who at the first hearing testified that his eighteen-year-old niece, who had a five-months-old baby, would care for Sheila. At the second hearing his niece had moved, but his plans were for his mother, who was in the process of getting a divorce, to care for Sheila. Finally, at the third hearing defendant was married to a woman with two children of her own and it was his intention for her to provide the maternal guidance necessary for his daughter.

■ There is no doubt that the discretion of the trial court in custodial awards is subject to review. Cohn v. Scott, 231 Ill 556, 83 NE 191. However, it is difficult to reverse a trial court's decision because he is in a far better position to assess the demeanor of the parties and to judge their emotional stability. We are especially reluctant to reverse the instant decision because of the emotional impact another change of custody may have on this minor child. However, we are unable to say that the requirement of a positive showing that the best interests of the child would be served by denying plaintiff custody has been met.

■ For the foregoing reasons the order of the trial court of St. Clair County awarding the care, custody and control of Sheila Akin to the defendant is reversed and

this case is remanded to the trial court for further proceedings not inconsistent with this opinion. However, the trial court is directed not to transfer the custody of Sheila until this judgment becomes final.

Our view of the case makes it unnecessary to consider arguments relating to a denial of plaintiff's petition to modify the custody decree.

Reversed and remanded.

GOLDENHERSH and EBERSPACHER, JJ., concur.